Mr. Court, Counsel. A short introduction, factual, maybe 30 seconds or so, to bring up the facts that are important to this appeal, probably is in order. Venus Rouhani, Dr. Venus Rouhani, slipped and fell at a pool by the poolside at the Towers of Town Lake, which is a large condominium in Austin. She broke her arm and she sued Towers of Town Lake. Towers turned the claim in to Wortham Insurance Agency, which is also known as Consolidated Insurance Agency and several other names, that's not in dispute. It was done within a week or two after the lawsuit was received. Wortham, in turn, put Nautilus Insurance Company, a primary carrier, on notice of the claim. At that point in time, Wortham did not put Philadelphia Insurance Company, Philadelphia Indemnity, on notice of the claim. As the Court is aware, this case has had a long history. The case was tried after settlement negotiations failed. The settlement negotiations went like this. The first demand was $800,000, which was $200,000 less than the Nautilus primary policy. The case went to mediation, and at mediation, a $215,000 lowest best demand was made by the plaintiff, and $150,000 offer was offered. The case did not settle, sadly. The case was tried, and a $1.7 million judgment was rendered. It was at that point that Philadelphia was officially put on notice of this claim. They refused to have any part in settling the claim because they had exclusions in the policy for poolside accidents. Who put Philadelphia on notice after the judgment was rendered? I believe that Wortham told McGowan. Wait. Don't tell me I believe. Again, counsel are supposed to know the record, so tell me, who put Philadelphia on notice? McGowan and Company, after being advised by Wortham of the judgment. At any rate, the first issue in the case is whether or not notice to Wortham back a week after the lawsuit was filed constituted notice to Philadelphia. When we first went through summary judgment practice before Judge Sparks, we raised the issue that Wortham was their agent because they're listed on the front page of the policy as being the producer through another one of their names. An affidavit was filed. As I said, Wortham Agency is not now and has never been an agent of Philadelphia in any manner whatsoever. This was sufficient to raise a fact issue. We agreed to it. They had a countervailing affidavit to what appeared on the face of the policy. Judge Sparks agreed. Philadelphia agreed there was a fact issue. We came up here. We argued the case on the issue of whether or not there was prejudice from the late notice under the assumption that the notice to Wortham was not notice to Philadelphia. When we were remanded back, Judge Sparks allowed some discovery on the issue of agency. We subpoenaed Philadelphia and during the course of the discovery process, no less than four agency agreements were produced between Philadelphia and Wortham and its related companies. Four. This included one that was in effect at the time that this policy was placed and the time this loss was reported to Wortham. And that's the 2002 agreement. Correct. And Judge Sparks identified and the parties agreed that that is the one. Now, the argument is, oh, well, yes, there is an agency relationship. Contrary to the express unequivocal blanket statement, there was never any agency agreement in any manner whatsoever. But this didn't apply in this particular case, that they're not really an agent. Well, that's just wrong. It is entitled an agent agreement. It states on the first page, or the second page, rather, at record 2273 in the clean copy, 2213 in the copy that's unfortunately been highlighted, that Wortham appoints agent, I'm sorry, Philadelphia appoints agent Wortham as its representative. Philadelphia states 42 times in that agreement that Wortham is its agent. Philadelphia says that Wortham is appointed as its representative subject to the laws of the state in which the agent is authorized, i.e., Texas, and subject to the terms of the agreement. Texas does not have an agent license. Philadelphia requires Wortham to carry errors and omissions insurance in paragraph number 2 of the 2002 agreement. It requires Wortham to have a valid enforced agent's license on file, similarly to paragraph 2. It requires Wortham to provide proof of both of those things to Philadelphia before it can act as its representative. It requires the only restriction in this agreement is that Wortham is not allowed to bind insurance for Philadelphia unless Philadelphia ratifies the insurance that it places. Your point is, what type of agent is Wortham for Philadelphia? Is it express? Is it implied? Or is it apparent? Express. So that's what you're relying on before us. Yes, Your Honor. So you rely only on express as a category for being an agent. Express under a contract of agency, yes, called agent agreement, yes, express. When express, implied, and apparent, you're only arguing to us that it's an express, expressly appointed agent. Yes. Now, the Court, based on Philadelphia's briefing, looked at paragraph 7 of the agent agreement that has the only restriction on Wortham's ability to act. It says, the first sentence says, agent and its officers, agents or employees, are not agents of, and have no authority, express or implied, to bind company or any of its principals. The Court in Philadelphia ruled, or argued from that, that this means they have no authority to do anything for Philadelphia at all. But bind has a meaning in insurance law. It means to bind the insurance company to risks, to have the underwriting pen of the insurance company, have the authority to make contracts for them. If the Court in Philadelphia had looked at the second sentence of the same paragraph, you would see the clear intent of that restriction, the sole restriction in the policy is, no insurance submitted for consideration shall be effective until agent receives company's consent and acceptance thereof. In other words, paragraph 7 is limited, only, is the only limitation of the policy, and all it limits Wortham to do. Well, in the 2002 agreement, does it provide instructions on how to report claims to Philadelphia? No, it does not. Does it provide instructions on how to provide claims to Wortham? I'm not Wortham, but McGowan. No, it does not. Later on, they clarified that in the 2009 agreement, which is in the record, and it instructs Wortham that it must report all claims to Philadelphia that it receives under policies that are written through it. But it's not spelled out in this agreement. The reporting of claims, however, is an implied authority that flows from the express authority. The court, in limiting the extent of the authority of Wortham, relied on the Crooks case. But as we pointed out in our briefing, the court jumped over us. I'm trying to catch up to what you said. The reporting of claims is an implied authority which flows from the express authority. The express authority is found in paragraph one, which is in our appendix, and it's in the record at page 2213. The company hereby appoints agent as its representative, without exclusive territorial rights, subject to restrictions placed upon agent by the laws of the state, states in which agent is authorized to write insurance, and further subject to the terms and conditions set forth therein. I'm sorry. I'm trying to find out what you're talking about. I'm looking here at tab number two in your record. It excerpts what paragraph? It's on the second page of it, at page 2213. All right. Paragraph one. Company hereby appoints agent as its representative, subject to restrictions placed upon agent by the laws of the state, states in which agent is authorized to write insurance, and further subject to the terms and conditions set forth therein. The point here is that . . . I'm sorry. It talks about reporting claims in this agreement. No, it does not. But if you read the Crooks case, implied authority can be based upon the natural . . .  If an agreement sets forth powers of an agent to do things, i.e., to act as a representative, then the agent impliedly has the authority to do everything necessary to fulfill that representative capacity. In other words . . . Which is to receive claims and then report them to Philadelphia? Or is reporting to that agent effectively a report to Philadelphia? Is that your argument? That's my argument, is that a report to Wortham was a report to Philadelphia's agent, and under the law, the elite towing case, and under the Hornbook law . . . So tell me, what implied authority are you talking about? Anything that's necessary and incidental for an insurance agent of an insurance company to do. And this is . . . He has implied authority based on this agreement to do anything . . . Go to the store and buy groceries, but don't buy any popcorn. That means she has no authority to buy any popcorn, but she can buy anything else she wants. And I guess I thought you told Judge Barksdale you weren't talking about any kind of implied authority. Maybe I misunderstood what you said. There's two bases for authority. One just comes from the actions of the principal and the agent. There's also express authority, which comes from a contract or an express delegation. If you have express authority, which is what I was answering him, then flowing from that is the implied authority to do everything that's necessary to carry out what's set out in the express agreement. So it's a subsidiary responsibility. Now this isn't . . . You know, in . . . I'm sorry. No, no. You go. So in carrying out this agreement, you read this agreement to imply that in the furtherance of this agreement, it's necessary that there is authority that Wortham can receive . . . Well, what I'm saying is that if I say you're my representative for everything except for what's accepted in this contract, which is what paragraph one says, you have the authority to do the things that agents usually do for their insurance carriers, which includes receiving those claims. Wait, wait, wait, wait, wait. So you're talking about implied within some kind of industry norm. Follow my example. That's right. At the least . . . Just follow my example so they're not going to understand, okay, getting out of your mind. You've got two big insurance companies, Allstate and you've got State Farm. All right, State Farm employs the good neighbor policy. The agent is from the neighborhood. The agent sells the policy. You call me at 3 a.m. in the morning. I'm at your house. I'll put the fire out until the fire comes . . . until the fire people come reporting. In that norm, we'd expect that with the good neighbor, that I could follow an example implied in the good whole normative, is that the agent gets the claim, reports it, blah, blah, blah. On the other hand, Allstate doesn't use the good neighbor deal. It's up here. You've got a claim. You've got a number. You call the claim service, et cetera, et cetera. That's a whole different norm. Just from my own sense, that's two different ways of operating. Are you arguing that there's some kind of normative industry context between these carriers such that one draws this implied ability to do the acts you're talking . . . because I'm not following it . . . in the wide spectrum of how this implication can be when, in fact, in the examples I gave you, there are two different ways in which this would be held. Where is the implication drawn from is what I'm asking. Are you talking about because of the uniqueness of the relationship between these parties and their industry norm, or are you talking about something that's in an insurance treatise normative sense? Between Wortham and Philadelphia, there was a contract. The contract says, you are acting as our representative. You're acting as our representative for everything that a representative does. You speak for us. You talk for us. You listen for us. The only thing that you don't act for us with respect to is writing insurance, binding an insurance contract. But acting on claims, it's sort of like talking about what's covered. Everything's covered except what's excluded. In the insurance industry, people take a lot of time to write the exclusions, and if they miss the boat, then it's covered. My point being, it's not following the argument that on a very, very significant aspect of insurance operations, you're arguing that the power to receive a claim, act on it, etc., is amorphously within some implied doctrine as opposed to it being expressly laid out or something in the norm that one looks expressly to see whether one can or can't. Not quite. In this instance, it's just the receipt of the claim notice itself to be passed on for handling by Philadelphia. I have a second larger point. In fact, why don't I just use my rebuttal time now, if that's all right with the Court? Well, we're not forcing you to do that. You do it at your own risk, but given that you're outnumbered over there at the other table, you may want to save your five minutes, so why don't you do this? We've got the point. We've asked you some questions, and why don't you save your time for rebuttal? Since we've raised it, if you then want to add to that within rather than you totally give it up, because if you give it up, it's gone. All right. I'll just do that. I'm not telling you. If you insist on it, you can use it now. All I would say on that point, if I may, is one minute. Nope. You've got to tell me either you want to take my advisory and come back up on rebuttal and use it to cover whatever, or I'm going to start the clock on you now. I will go ahead and use it now. Fair warning. Can I call for a landline call? Nope. Fair warning. You got it. The second point is, if we assume that notice to Wortham is not or was not implied notice to Philadelphia, then, obviously, it was late notice to Philadelphia coming after the verdict. The question then is, under Texas law, as it now exists, as it now exists, not as it existed in 2012 when the initial opinion was rendered, is prejudice presumed when a notice is given to the insurance company, the excess insurance company, after the verdict has been entered? The original decision relied heavily on the Clarendon and Motiva cases, and if you look at the original opinion, you'll see the citations of those cases. Back then, the court held that when an insurer receives notice after a verdict or settlement, all the insurer has to do is show that the terms of the policy weren't followed and prejudice is presumed. To quote the Clarendon Court, Clarendon v. FFE, where notice was given after settlement, whether Clarendon would have accepted the settlement offer, as FFE urges, is immaterial to the point. The fact remains that FFE's failure to give notice caused Clarendon to lose a valuable settlement right. Motiva, the Fifth Circuit held, when the insurer is not consulted about the settlement, the settlement is not tendered to it, and the insurer has no opportunity to participate in or consent to the ultimate settlement decision, we conclude that the insurer is prejudiced as a matter of law. In Lenar v. Markell, the insurer went about settling, in the Supreme Court case, the landmark Supreme Court case rendered last year, the exact same argument was raised by Markell because they were not permitted to participate in settling claims. Indeed, Lenar went around soliciting claims against it, and Markell argued when an insurer is not asked to adjust a claim, provide a defense, or be involved in negotiating a settlement, but is simply told it has to pay for a voluntary payment, the insurer has suffered prejudice as a matter of law. Judge Sparks, in our Court, in our opinion on the first appeal, and Judge Sparks on remand in granting summary judgment certainly didn't presume prejudice, he found prejudice, I mean, for the purposes of summary judgment. Judge Sparks held . . . No genuine dispute of material fact that Philadelphia was prejudiced, so there's no, no, you can talk all you want about this change in Texas law, but Judge Sparks followed the very procedure you're advocating he should have followed. Judge Sparks held that whether or not there was proof of prejudice or not, he found there was prejudice as a matter of law. He found that prejudice was presumed in this case, that's why he granted motion for summary judgment in their favor, instead of having a trial on the merits as to whether there was prejudice that had to be proven as a matter of law. After further discovery, in any event, summary judgment we reviewed de novo, so whether he presumed or didn't presume, we'll still follow whatever the Texas law is, and I think that . . . And what our Court laid out in its opinion on the first appeal. The point here is it's could have versus would have. What they could have done under the terms of the contract versus what they would have done and would have succeeded at, and that's the new level of proof under Markell. I want to speed up to get to where I think you're going. Let's do away with any presumption of prejudice to the extent one exists, and your argument is there should not be. Correct. And so where there is no presumption of prejudice, in a situation where, like here, if we assume that they never found out about this until post-judgment, how were they not prejudiced? They were not prejudiced because they wouldn't have done anything differently. The only proof they put on is the affidavit of William Groves, who is not qualified for the reasons set forth in our brief, and he said they were deprived of the opportunity to negotiate, to investigate, a sentence like a 17-word sentence. Our adjuster, the primary adjuster for Nautilus, Richard Conrad, testified even if Philadelphia had been at the mediation where the 215 versus 150 offer was made, even if they'd been there beating on them, it wouldn't have made any difference. Philadelphia could not have changed the result, and they produced no evidence to show that they would have done anything different. If they kicked in the extra money, how that wouldn't have changed the result? They didn't put any evidence that they would have kicked in the extra money. That's the point. They have to put somebody on the stand. We don't just imagine testimony. We don't imagine mediations that might have happened. We don't imagine what Philadelphia might have done. They have to put on a witness that said, we would have done this, and the fact of it is Dale Crawford, our industry expert, testified no excess carriers ever do this under these circumstances. So did Richard Conrad. No evidence on the other side was presented, no countervailing affidavits, no testimony, and as Judge Sparks put in his experience 40 years, if I might quote, what irritates me is you would never have done that because everybody knows they just never do that. That's why we put on expert testimony. Now a jury should decide that issue at the very least, just like the jury had decided in Markell. As Judge, now Justice Guzman, said in footnote 14 of the Coastal Refining case, 218 Southwest Second 279, if the abstract loss of the rights to investigate, defend, participate in, and control settlement negotiations were sufficient to show the necessary prejudice, then delaying notice to primary until after settlement would always result in forfeiture of coverage. But that's not Texas law. She's now on the Supreme Court of Texas. This was her 2007 opinion. So we have a pretty good indicator of what's going to happen if this case was presented to the Supreme Court of Texas. They would require Philadelphia to put on real evidence, not imagined scenarios of mediations, not imaginary drop-down situations, real evidence from qualified witnesses to convince a jury they would have come down and that they would have made a difference when they did come down and drop in on the mediation investigation. And that's just, this is a fact-proof problem, and they didn't produce any facts. So summary judgment should have gone our way. All right. Thank you, Mr. Tollefson. We'll hear from Philadelphia. Come in. I just want to take a moment briefly to clarify some of the misstatements that counsel made during his argument. As an initial matter, Wertham did not notify Nautilus, the primary carrier. It actually notifies specialty insurance managers. Specialty insurance managers, they in turn notify Nautilus. So not only do you have the additional layer of an intermediary agent between Wertham and Nautilus, you have that same intermediary agent between Wertham and Philadelphia. There was never any direct notice from Wertham to the primary carrier or to the excess carrier. Who was special? They're an intermediary agent. They're the ones that received notice from Wertham. They in turn provided the notice to Nautilus. The other issue I'd like to address are the agency agreements that counsel has mentioned. First of all, they're not called agency agreements. They're agent agreements, as in insurance agent agreements. He makes much about the fact that 42 times the word agent is referenced. However, there is nothing in the four corners of this agent agreement that can remotely be considered as conveying any sort of claims handling, claims management, receipt of service, receipt of notice of claims in that agreement. The agreement expressly states that no agent has the authority to bind Philadelphia. By allowing Wertham to accept notice of claims, that in essence is trying to bind Philadelphia. It further indicates that no agent, Wertham is not an agent of Philadelphia. That's expressly stated in the contract. But more importantly, paragraph ten states that that agent agreement only applies to policies that are placed by Wertham. As the district court correctly pointed out, this policy was not placed by Wertham. It was placed by McGowan. So while 2002 may be arguably the only relevant policy or agent agreement at issue, it's not applicable under the circumstances. Berkeley now contends that this is only relying on or attempting to establish authority expressly. However, the case law is clear. In order for there to be express authority, it has to be delegated to an agent by words that expressly and directly authorize the agent to do an act or a series of acts on behalf of the principal. It relies solely on the 2002 agent agreement, which is not applicable. However, there is nothing within the agent agreement that conveys this authority. You cannot have implied authority if there is no express authority. If you don't have express authority, you don't have actual authority. They are unable to point to any evidence, contrary to their appellate brief, that establishes any course of dealing between Philadelphia and Wertham, or Philadelphia and Towers. According to Wertham's answers to the depositions of written questions, Wertham has never accepted notice of claims on behalf of Philadelphia. Towers had never reported any claims to Wertham, and Wertham has never accepted those claims on behalf of Philadelphia. Philadelphia has had zero communications with Wertham with respect to this policy. If Berkeley's position was adopted, that means literally thousands of insurance agents across the country for Philadelphia would have the ability to accept notice of claims, accept service of suits. According to Berkeley, the only limitation is on the ability to write insurance. That is simply not supported by the four corners of the document. That was my question, because when you read the, I know this isn't binding, but when you read the whereas provisions at page one of this agreement, the first one is agent, that would be consolidated insurance agency, desires company, that's Philadelphia, to ensure risk of agent's clients, whereas company, that's Philadelphia, expends time, money, and renders valuable services in ensuring such risk for agent. So it does seem to be a limiting from the get-go to only, this agreement seems only to deal with insurance placed by the agent for Philadelphia, and that's the sum total of it. Yeah, I would agree that this is simply an agreement where you're allowing the insurance agent to go out, solicit insurance on behalf of the insurance agent's clients, and we are agreeing to pay commissions. To read this any broader would be to infer provisions that simply do not exist in the provision. It would be to render meaningless the provision that says you cannot bind us, and that you are not our agent. There's nothing in this agreement that limits, where it states that it extends no binding authority to any agent, that's exactly what it means. That there's no binding authority to allow an insurance agent, who in this case is nothing more than a broker, Towers went to Wortham and said procure us insurance. Wortham could have went to any number of different insurance company. This was a non-exclusive agreement anyway. So it wasn't a situation where they were acting as our exclusive insurance agent, and they went out and solicited Towers. Towers approached Wortham. Wortham went out and inquired as to different types of policies that would be suitable for Towers. And they ended up with the Philadelphia policy. They didn't place the Philadelphia policy. They went through an intermediary agent. They went through McGowan. McGowan is the agent that actually placed the policy. So paragraph ten states that this agreement doesn't even apply to this policy. Councilor, I hate to fast forward, but I'm ready to assume, at least argue in though, that your client didn't get noticed until post-judgment. And that would be correct. And based on this court's prior ruling in Berkeley 1, this is a no-notice case. It's prejudice as a matter of law. So that's your argument, that it's prejudice as a matter of law, and you don't have to show any other facts to demonstrate that you've been prejudiced. It's notice post-judgment, prejudice as a matter of law. Correct. But we've also argued in our brief and in a summary judgment motion that even if this court decides to find that there's no prejudice as a matter of law, that prejudice after a jury verdict, that there's no prejudice after extensive settlement negotiations have taken place, we've established that we've actually been prejudiced. And we rely on more than the affidavit of Mr. Groves. We rely on the testimony of Nautilus's corporate representative, where he states, had he known that there was an issue with the way this case was defended, that may have changed his position regarding settlement. We put evidence before this court and before the district court that demonstrates that this case was not handled by competent counsel. We put forward evidence that this case could have been settled many times— Counsel, as a practical matter, the underlying claim is one where, as I understand it, there was a demand from the plaintiff where settlement could have been reached for around $250,000, something like that? That is correct. And the coverage, because yours is an excess carrier. Right. So there was coverage up to $1 million. Correct. Are you representing then that on a claim where there's a demand for $250,000 and your obligation to do anything in connection with that claim is not triggered until we're above $1 million? That your client would have been involved in settlement negotiations and willing to make a contribution where the primary carrier had a policy which went all the way up to $1 million. Is that what you're saying? What I'm representing is that we were deprived of the opportunity to be involved in the investigation, involved in the evaluation of the settlement demands. You have to understand that at the outset, this was— You may have been able to convince them that it was in their best interest to go ahead and pay from their own money. Or we could have made up the difference. Now, this case started off at $800,000, and this happens all the time where you have excess carriers that may get in a room with a primary carrier at mediation. They take care of the plaintiff, and they decide to maybe duke it out in arbitration to figure out who had the better argument. Should this case have been settled? Should a contribution have been made by the excess? Let me tell you kind of what my thinking is, because he seems to be arguing that, absent the presumption of prejudice, then you need to demonstrate that the result would likely have been different if you had the opportunity to participate in the settlement discussions, negotiations, everything leading up to the verdict. In other words, your observations of the defense and how that was being handled, all of that. His position seems to be that you need to demonstrate that some actual prejudice to the extent of saying things may have been differently if we had been involved. You need to do that versus just saying the raw denial of the opportunity to participate is sufficient evidence that we were prejudiced. But I think, one— Do you understand my question? Yes, I understand, and I believe he's misstating the law. The law doesn't require us to show that there would have been a different outcome. The law states that were we deprived of a valuable right, could we have exercised our rights under the policy? We produced the affidavit of William Gross, who states that had we known we would have contributed to the investigation, the development of a defense, participated in a lawsuit, and evaluated those settlement demands. What he's asking is for us to speculate more, that what we've done is not speculation enough. That's what the inherent fairness of this is to carriers. You're expecting a carrier after a jury verdict to look through a crystal ball for nearly three years to state what you would have done at various points and times, which would vary based on the information that was available to the insurer. Let me stop you there. All right, we've got it up on summer judgment, right? I'm sorry, I couldn't hear. We have it up on summer judgment. All right, so are you saying to us that our de novo review of the record, counsel opposite says somebody's affidavit is in there, you know, you're demonstrating to us the agent from Nautilus, et cetera. My question is, given it's Rule 56 and we've got it on de novo, you're saying we will conclude that there's no genuine issue of material fact with respect to, you know, this prejudice issue of what would have happened, et cetera, et cetera, or that the facts are inconsequential, that as a matter of law, the summer judgment is correct. You following my question? Yes, I'm working on that. I'm trying to know whether I'm just hearing you're saying my witness has said this, he says he got an affidavit that said that, you know, whether it's a fact issue that, you know, we got it here, or whether putting aside whatever's in all those affidavits that you win or decline as a matter of law. Help me. I'm actually arguing both, that as an initial matter, it's prejudice as a matter of law once you get notice after a jury verdict. But even if this court decides that it's not as a matter of law, we had sufficient evidence and overwhelming evidence that there was actual prejudice. And our facts have not been refuted by Berkeley. What's undisputed is that there were opportunities to settle this case, that that's a lost settlement value, that we know the value of that lost settlement because we know what the amount this case could have settled for. This is undisputed. They do not dispute that the wrong case was defended, that they put on the wrong theory of the case. They have never introduced any evidence demonstrating that this case would not have settled for less than not only the judgment, but it could have settled for less within policy limits and within defense counsel's evaluation of the case. Defense counsel evaluated this case as being anywhere between $300,000 and $500,000 settlement value, but yet they refused a $215,000 settlement demand. That demonstrates not only was the case improperly handled, but there was no one looking out for Philadelphia's interests. In essence, they decided to gamble. They rolled the dice, and now they want Philadelphia to step in and pay $700,000, even though they have never notified us about this case. Well, that's my... I'm sorry, circling back, you several minutes ago said there's been no notice. I thought it was understood that after the judgment was rendered, Philadelphia did receive notice. We received notice after the verdict. Ma'am? After the jury verdict. Okay, after the jury verdict. So why are you saying no notice in the light of you receiving notice after the jury verdict? Well, one, this court in Berkeley, one, established that this was a no-notice case. However, the case law appears to establish that when liability has been established and all of your rights material to the policy have been foreclosed because you have not received notice, that is a no-notice case. That is prejudice as a matter of... Even though it's only after the jury verdict and there's still a right of appeal? And we know that during the appellate process is overwhelmingly deferential to a jury verdict. So basically, if the position is... You're not answering my question. Are you saying that even though the right of appeal continued and Philadelphia could have jumped in and righted all wrongs on the appeal, you're saying you still didn't receive notice even though you still had an appeal to contest the verdict? Or the judgment. I don't know if the judgment... Was the judgment less than the verdict? No, it basically confirmed what the jury awarded. I thought you earlier said that someone said there was some $7 million verdict, but I know it's only for a million something. So I must have heard wrong. No, I'm sorry. I didn't catch that. What I am saying that is still no notice even if there is an appellate process that's yet to be done. The fact of the matter is that by the time you're at the point of appeal, you're stuck with the record that has been reserved by trial counsel, trial that Philadelphia had no participation in. And the fact of the matter is an appeal does not right all wrongs. I mean, given the deference has given to jury verdicts, given the fact that we were not present to see any objections, whether they even preserved error properly at the trial court level, we are certainly in a different position after a jury verdict, a substantive adverse position. Prior to a jury verdict, we're still able to go in and defend the case. We can still challenge the plaintiff. The plaintiff still has to meet their burden. After a jury verdict, the burden has been met. Liability has been established. We can't un- I'm sure I read that in your brief about no verdict. I mean, no notice whatsoever. I went back and reread it. I must have missed it. But where in your brief do you say there is no notice because this was after the verdict? I believe it's in the very first section of my brief. We've argued that this was a no notice case, that when we moved for summary judgment, it was based in part on what Berkeley won world, was that this was a no notice case. And on remand, this court sent it back to Judge Sparks and said that it left up to the district court to decide whether or not we were entitled to summary judgment in light of the analysis here provided. Well, I felt on the first appeal, the court didn't even reach the question of whether there had been notice because Judge Sparks didn't consider that. He went immediately to whether there was prejudice. Well, they assumed notice for purposes of the appeal. In a footnote, I believe it states that yes, because there's an issue whether there was constructive notice, we kind of set that aside. But for purposes of the appeal, they assumed notice had taken place and they could actually make the determination of prejudice. And I may have been misunderstanding you. But what we have always argued is that this is a no notice case. Regardless of whether there's been a judgment or regardless of whether or not we've made it to the appellate process, notice after a jury verdict, after liability has been established, after the investigation has already concluded, after experts have been struck in this case, is prejudice as a matter of law. Your Honor, that's all I have unless you have additional questions. I think that you answered my question. Your response to me was that it's a matter of law issue for us, not the fact issue I was trying to... Our process diverted during the last question about the no notice. But your answer to me was that when we look at the summary judgment record, we're not going to conclude that there are fact issues vis-a-vis who knew, who didn't, and all that. You're saying that summary judgment was proper as a matter of law. That's what you're arguing. Right. That's the answer to my question, is it? Yes, as a matter of law and as a matter of fact. We moved for summary judgment on both whether it was as a matter of law and we argued on the alternative that our evidence established actual prejudice and that they failed to introduce any competent summary judgment evidence refuting actual prejudice. All right, so counsel, opposite statement about... May I have the excuse? Hang on, hang on. Will that you go? Just trying to make sure I got it straight in my head. He made an argument about somebody's affidavit or testimony, I thought. Which, when I heard it, suggested to me that there was contrary evidence in here about the notice and the rest of it. But I didn't get the sense that it actually was deposition evidence or testimony or whatever. But at bottom, I won't prolong the point. You're saying that there's no evidence when we look in this record that we're going to find that there are any fact issues. That's what you're telling me, right? All right, and that as a matter of fact, based on they're not having controverted what you've put in, but moreover, as a matter of law, that's what you're urging? Yes. And I'm sorry, if I just may add one thing. I think he was referencing the affidavit of Dale Crawford, where Dale Crawford says, Philadelphia would have never done this. Which, one, I don't think his competent summary judgment is not reliable and it's conclusory and speculative. However, under Claritin, Claritin makes clear that it doesn't matter what you would have done. That evidence of what a carrier would have done under any set of circumstances is completely irrelevant once you have failed to provide notice. So I just wanted to add that. All right. Well, I'm still skeptical whether you, in your brief, you claim no notice, but I'm sure counsel on rebuttal can inform us of that. Well, he doesn't have any. He gave it up. Oh, that's right. They threw in the towel. He gave it up. I tried to give him the benefit of it. I'll say this. If you are, if your brief does say there was no notice, you ought to have done a better job of highlighting that because I quickly skimmed over it again looking for, there was no notice and I don't see it. But again, I'd certainly be missing something. All right. All right. Thank you, counsel. Thank you, counsel, for both sides of the briefing.